White Mountains R R. *v.* White Mountains (N. H.) R. R. & a.

Where a statute provides that a corporation shall be dissolved by a mortgage sale of its franchises and property, an illegal and fraudulent sale does not work a dissolution.

It is no objection to the maintenance of a bill in equity to compel a corporation to restore property acquired by fraud, that such restoration will cause a dissolution of the corporation.

In 1853 the White Mountains Railroad mortgaged its franchises and property to trustees for the security of bondholders, the mortgages containing a power of sale. In 1857 the trustees applied to the supreme court for an order to sell. The mortgagors withdrew their opposition to such an order upon an agreement made by a combination of bondholders (intending to purchase at the sale), that the full value of the property should be accounted for to the mortgagors on their debts, irrespective of the price realized at the sale. In 1858 the trustees, having obtained a decree for a sale, sold the property to this combination of bondholders for much less than the real value. One of the trustees received a bribe from the purchasers to induce him to act for their interest at the sale, and he did so act. The purchasers formed themselves into a new corporation, and credited the mortgagors on their debts with only the price realized at the sale. The trustees made no return of their doings to the court. In 1859 the legislature passed an act confirming the sale. The mortgagors were ignorant of the bribery of the trustee until 1866, and did not learn until 1867 that the purchasers would not carry out their agreement to account for the real value on the debts. Upon demurrer to a bill in equity brought by the mortgagors in 1868, *held*, that, inasmuch as the mortgagors consented to the decree ordering a sale, the property would not be restored to them upon payment of the debts; but that the sale in 1858 was invalid as against the mortgagors, and that they were entitled to relief.

The legislature has no power to confirm a fraudulent sale of the mortgaged property of a corporation.

In Equity. The questions arise upon demurrer to the bill.

The defendants are the White Mountains (New Hampshire) Railroad; the trustees under the mortgages to secure the bonds of the White Mountains Railroad; the holders of said bonds; and The Boston, Concord & Montreal Railroad, lessees of the White Mountains (N. H.) Railroad.

The allegations of the bill, which was filed August 29th, 1868, are in substance as follows: In 1853, the plaintiffs issued bonds to the amount of one hundred and eighty thousand dollars, secured by mortgages to trustees of the railroad and franchises, and all the real and personal estate of the plaintiffs; the mortgages containing a power to

sell in certain contingencies.   By an act of the legislature of New Hampshire, approved June 27, 1857, entitled "An act for the relief of the stockholders and creditors of the White Mountains Railroad," it was provided that the trustees to whom the railroad franchises and corporate property was mortgaged with power to sell the same, might sell the same agreeably to the terms of the mortgage deeds, provided that every such sale should be made under the direction of the supreme judicial court, which should have power to decree a sale by shares or otherwise.   On the 30th day of December, 1857, the three persons, who were then by appointment trustees of said bonds, applied by petition to the supreme judicial court, praying that they might have permission to sell said railroad, its franchises, fixtures, and property, as provided by said mortgage deeds and by said act of the legislature ; and said court, at a term thereof held on the 3d Tuesday of July, 1858, ordered and decreed that said trustees might sell the said railroad and franchises and property thereof conveyed to them in said mortgages according to the provisions in said mortgages, and hold the avails of such sale to be disposed of according to the provisions of said mortgages and the order of said court.   After said decree, and previous to any attempted sale of said road under said decree, Benjamin T. Reed, Ezekiel J. M. Hale, George Minot, and other persons, then representing about $160,000 of said bonds, made an agreement in writing that said Reed, Hale, and Minot, or a majority of them, for and on behalf of the subscribers to said agreement, should make a purchase of said property at the proposed sale thereof by said trustees at such price and on such terms and conditions as they might think advisable, and if such purchase should be made should take proper steps for organizing the parties interested into a new corporation under said act of the legislature, approved June 27, 1857.

Under said agreement, said Minot was appointed an agent for the parties thereto to bid off said railroad at the proposed sale thereof by said trustees, for the benefit of the signers to said agreement.   On the 3d day of November, 1858, two of the trustees pretended to sell at public auction the said railroad, its franchises, and all its real and personal estate, to said George Minot, for the nominal sum of $24,000, and on the 4th day of said November executed a deed of that date purporting to convey said railroad and all the property mortgaged to said trustees to said George Minot ; and on the 23d day of November, 1858, the said Reed, Hale, Minot, and others, parties to said agreement, purporting to act in pursuance of said act of the legislature, organized as a body corporate and politic under the name of the White Mountains (N. H.) Railroad, and on the 31st day of January, 1859, said Minot executed a deed to said White Mountains (N. H.) Railroad purporting to convey to said White Mountains (N. H.) Railroad all his interest in said railroad, and all the property real and personal of the said White Mountains Railroad, and the said White Mountains (N. H.) Railroad immediately took possession of the said railroad and all of its personal and real estate, and used and enjoyed the same and the income thereof until February 4th, 1859, when they leased the same to

the said Boston, Concord, and Montreal Railroad for the term of five years, at the rate of $10,000 a year, and at the expiration of said lease for five years, again leased the same to the said Boston, Concord, and Montreal Railroad for the term of twenty years, at the rate of $12,000 a year. The rent of said railroad was paid to said White Mountains (N. H.) Railroad semi-annually by the said Boston, Concord, and Montreal Railroad, according to the terms of said leases, and by said White Mountains (N. H.) Railroad paid out in the purchase of certain of said bonds as hereinafter described, and in semi-annual dividends to its stockholders. The capital stock of said White Mountains (N. H.) Railroad was fixed at $200,000, and was distributed among the bondholders who signed said agreement, each bondholder receiving such a proportion of the stock as his bonds bore to the whole amount held by the signers to said agreement. There was no subscription to stock in said White Mountains (N. H.) Railroad, and no one paid anything for said stock, but received his stock by virtue of being a holder of said bonds, and no one held any stock in said road except by reason of his being a holder of said bonds, except one of said trustees, who did hold at the time of the issue of said stock and now holds $5,000 of said stock without having the corresponding amount of bonds as stated hereinafter. The trustees made no return of their proceedings to the court; and no decree was ever made by the court confirming or sanctioning their doings. Said pretended sale is alleged to be utterly null and void, as to the plaintiffs, for various reasons which are specified.

The sixth reason is, in substance, as follows: Because the said Reed, Hale, and Minot, who were, under said agreement, the agents for said purchasers, in order to induce one of the trustees to consent to said sale, and to act at said sale for the interest of said purchasers, corruptly and fraudulently agreed with said trustee that if he would thus consent and act for their interest at said sale, he should receive as a consideration for said service the sum of $5,000 in the capital stock of the White Mountains (N. H.) Railroad. And the plaintiffs say that said trustee did at said sale act for the interest of said purchasers and in fraud of the plaintiffs' rights, and did endeavor to stifle and prevent competition at said sale, and by his own advice, suggestions, and interposition, cause said road and property to be struck off and sold to said Minot at the nominal sum aforesaid, and with intent and for the purpose of sharing and participating for himself and others in the benefit of said purchase; and to carry out said corrupt and fraudulent agreement said Reed, Minot, and Hale afterwards allowed said trustee to have and receive said $5,000 in stock, and said Reed as president, and said Minot as treasurer, of said White Mountains (N. H.) Railroad, signed the certificate or certificates of said stock and delivered the same to the said trustee, who has received the dividends and income thereof ever since, paying nothing therefor except the service as aforesaid. The railroad and property sold as aforesaid for the sum of twenty-four thousand dollars was at the time of said sale and is now of the value of two hundred thousand dollars or more; and the market value of the stock of said White Mountains (N. H.) Railroad is

one hundred dollars a share. Several of the bondholders and signers of said agreement, who held the bonds only as collateral security, had other security for their claims in the shape of notes signed by various sureties. Said bondholders have credited plaintiffs with a payment by reason of said sale of only $7.75 per each one hundred dollars of debt, and they now hold executions against various of said sureties, obtained on the notes signed by them; and one of said bondholders threatens to collect the executions now outstanding in his favor. The plaintiffs say that they did not protest against said sale and object to the possession of the property by the purchasers under said sale, because prior to the decree of sale the plaintiffs and certain sureties of the plaintiffs being opposed to said decree, and any sale under it, for fear said property might be sold at a sum much less than its full value, it was understood and agreed between them and those who subsequently became the purchasers of the property, that if such opposition should be withdrawn, such sale made, and possession of the property obtained under said sale, its full value should be accounted for to the plaintiffs on their debts; that is to say, that the bonds sold and delivered to *bona fide* purchasers as aforesaid should be cancelled, and that the security of the plaintiffs in said pledged bonds should not be impaired by said sale and possession of said property by the purchasers, but that the interests of the plaintiffs in said pledged bonds should be fully protected, whether said road and property sold at a nominal sum or at its full value. Nor did the plaintiffs learn until June, 1867, that said purchasers had allowed them as the proceeds of said sale only the small sum of $7.75 on each $100 of said bonds as aforesaid; and then for the first time learned that said purchasers would not carry out said agreement, and would not allow the plaintiffs any more than said $7.75 on each $100 of said bonds. And the plaintiffs were also ignorant of the fraudulent character of said sale, as before alleged, until August, 1866. And the plaintiffs allege that the possession and control of said railroad and property, real and personal, included in said mortgages, by said White Mountains (N. H.) Railroad corporation, and the Boston, Concord, and Montreal Railroad corporation, as aforesaid, is altogether wrongful and contrary to equity and good conscience. They therefore pray that an accounting may be had between the plaintiffs and the said last mentioned railroad corporations, and between the plaintiffs and all the holders of said bonds, and any others interested in said purchase as aforesaid; and that said railroad and property be restored to the plaintiffs upon such terms as to this court shall seem to be just and proper. And the plaintiffs say that they have not brought into court said sum of $24,000 for which said road and property was bid off at said pretended sale, nor any sum to be returned to said purchasers, because said purchasers did not pay said $24,000 to said trustees, but only a small part of the same, and what part the plaintiffs are unable to state, but are ready and willing and offer to pay in that behalf any sum that the court shall order. And the plaintiffs allege as a further reason why no money is brought into court to be returned to said purchasers that they have received

out of the income of said road and property a much larger sum than they paid for the property itself. And the plaintiffs allege that they are ready and willing and offer to pay all just debts that may be found due from them upon said accounting to said Reed, Hale, and others who hold said bonds in pledge as security for their claims, and to any other persons or corporations, such sums of money as the court may order them to pay upon the restoration to the plaintiffs of said road and property. And the plaintiffs pray for such other relief as may be just.

*C. W. & E. D. Rand*, for plaintiffs.

*H. Hibbard and Minot*, for defendants.

SMITH, J.*  The statute of 1857 authorizing a sale, provided that " the White Mountains Railroad shall exist as a corporation so long as may be necessary after such sale, for the purpose of settling its affairs and for no other purpose."

It is urged that under this statute the old corporation must be regarded as substantially extinguished by the sale and the subsequent proceedings; and that this bill is, in effect, for the dissolution of the new corporation; a result not attainable in this suit, but only by a proceeding in behalf of and in the name of the State. We need not inquire whether the existence of the old corporation is not admitted by the demurrer; for the statute of 1857 will not bear the construction put upon it by the defendants. That act had no effect to terminate the existence of the old corporation except after *a legal and valid* sale. If no such sale has taken place, the act does not apply.

The dissolution of the new corporation is not an object directly aimed at by the bill. If dissolution should seem likely to be the indirect result of compelling the new corporation to give up property acquired by fraud, such a contingency would afford no bar to a prosecution of the ordinary remedies against the new corporation by all parties interested in the property so acquired. In the language of plaintiffs' counsel, " The position of the defendants is, virtually, that if a corporation acquires property by fraud, the Court, before they make a decree to restore the property, must stop to inquire what effect such a restoration would have upon the charter of the corporation, and its capacity afterward to do business. As well might the Court stop to inquire what effect the restoration of stolen goods to the owner would have upon the business prospects of the thief. A corporation is not privileged to acquire property by fraud any more than an individual."

It is unnecessary to consider the sufficiency of *all* the reasons urged against the validity of the sale; for the sixth reason, alleging the bribery of one of the trustees and his fraudulent collusion with the purchasers, alone and of itself, affords ample ground for declaring the

---

* BELLOWS, C. J., and FOSTER, J., did not sit.

sale invalid as against the plaintiffs, unless their right to object has been in some manner barred.

The defendants strenuously contend that the plaintiffs are barred by their acquiescence, or waiver, at the time; and also by their long delay in commencing this proceeding.

The bill admits that the plaintiffs withdrew their opposition to a decree of sale, in consideration of an agreement by those who afterwards purchased at the sale that the full value of the property should be accounted for to the plaintiffs, whether it sold at a nominal sum or for full value. The failure of the purchasers to perform this agreement does not restore the plaintiffs to the position they occupied before the decree of sale, nor authorize them to revoke their own action and contest the validity of a decree to which they once substantially assented. If the plaintiffs have any remedy for the damage occasioned them by that decree, it must be by suit against the purchasers on their contract. Our conclusion on this point is, that the decree ordering a sale under the mortgages cannot be rescinded; and that, consequently, the prayer for restoration of the property, or, in other words, for redemption, must be denied.

But it by no means follows that the sale which was professedly made under that decree is to stand. It was not such a sale as was contemplated in the decree of the court, or in the act of 1857. The plaintiffs only acquiesced in a decree that a legal and valid sale should be made. They did not assent to fraudulent collusion between the trustees and the purchasers. Undoubtedly they contemplated the possibility that the property might sell for much less than its real value, for they took measures to guard against damage from such a result by obtaining the above-mentioned agreement from the purchasers. Indeed, the plaintiffs' conduct, in taking this security from the purchasers, and in delaying to commence this proceeding till they had discovered not only the fraud but the breach of the contract, affords some ground for the inference that after the purchasers made the above agreement it was a matter of comparative indifference to the plaintiffs whether the property sold for full value or not. Still, the plaintiffs never assented to the use of improper means to reduce the price; and it is not inconceivable that the plaintiffs might have been willing to trust the purchasers to make up the difference between the price realized at a fair sale and the actual value of the plaintiffs' interests, but not willing to trust them to make up the difference between the price realized at a fraudulent sale and the actual value.

Upon the whole, we think that there has been no such acquiescence on the plaintiffs' part in the fraudulent sale as should bar their right to object; and that they have exercised this right within a reasonable time after discovering that there was fraud, and that they had been damnified by it. Upon the allegations of the bill no laches can be imputed to them on account of the years which elapsed after the sale before the discovery of the fraud.

The defendants rely on the statute of 1859 (chap. 2297), entitled " An act to incorporate and establish the White Mountains (N. H.)

Railroad." Section 2d enacts that the railroad, corporate property, rights, and franchises of said corporation shall consist of the railroad, property, rights, and franchises of the late White Mountains Railroad, incorporated Dec. 25, 1848, which are described and conveyed in the mortgages of the said late White Mountains Railroad, executed on the 19th day of February, 1853, and the 17th day of December, 1853, and are also described and conveyed in the deed of the trustees under said mortgages to George Minot, dated November 4, 1858, which said mortgages and deed of said trustees are hereby ratified, confirmed, and made valid ; and said White Mountains (N. H.) Railroad are hereby authorized to maintain the railroad described in said mortgages and deed from * * * Haverhill to * * * Littleton, as heretofore constructed and established * * *.

Section 7 enacts that the agreement of said corporation with the Boston, Concord, and Montreal Railroad, dated February 4, 1859, relative to running the road of this corporation, is hereby approved, ratified, and confirmed ; and this corporation is fully invested with all the powers and privileges, franchises and immunities, granted to and conferred upon the late White Mountains Railroad by its act of incorporation, approved December 25, 1848.

It would not be unreasonable to presume that the legislature were ignorant of the fraudulent character of the sale, and, by confirming the sale, intended only to relieve the purchasers from the consequences of mistakes or formal defects.

But whatever knowledge or intention they may have had, the statute cannot operate to prevent the plaintiffs from invalidating the sale by proof of fraud. Such a result is beyond the power of the legislature. It does not come within the principle of that class of cases (decided in other States) in which a legislature has been held to have the power to confirm, by retroactive laws, the acts of public officers who have exceeded or imperfectly executed their authority ; or to cure defects in conveyances. Statutes of this kind " are of a purely remedial nature ;" their purpose being to correct mistakes in order that the intention of the parties may be carried out. The legal rights affected by such statutes are " deemed to have been vested subject to the equity existing against them ;" and the statutes accomplish only what, upon principles of natural justice, a court of equity ought to have power to decree. Such legislation has been held valid " when clearly just and reasonable, and conducive to the general welfare ;" " but the cases," says Chancellor KENT, " cannot be extended beyond the circumstances on which they repose without putting in jeopardy the energy and safety of the general principles." 1 Kent's Com. 456. In this instance the statute of 1859, if it cures the fraud in the sale, goes far beyond the correction of mistakes, or the remedying of formal defects ; and is not only open to objection as a retrospective law, but also as an act of a judicial nature. Could the legislature before the sale have passed an act authorizing one of the trustees to receive a bribe from the purchasers ? If not, how can their subsequent confirmation have greater efficacy than their previous authorization ? " The

healing statute must in all cases be confined to validating acts which the legislature might previously have authorized. It cannot make good retrospectively, acts which it had previously no power to permit." Cooley's "Constitutional Limitations on Legislative Power," 381, 382. It is unnecessary to consider at this time whether the class of cases referred to can be regarded as authority in this State where the constitution expressly prohibits retrospective legislation.

What, if any, measures should be taken to protect subsequent *bona fide* purchasers of stock in the new corporation, is a question which can be considered hereafter, if it should appear that there are any such parties. Upon the allegations of the bill, the plaintiffs are entitled to some relief. Whether the auction sale should be annulled and a re-sale ordered, or the purchasers be compelled to account for the property at a fair price, or whether relief should be granted in some other manner, need not now be determined.

*Demurrer overruled.*